## Hatfield *v.* Thomas Iron Company, Appellant.

*Evidence—Parol evidence—Contradiction of written instrument—Car short-
age—Contract—Sale.*

In an action for coke sold and delivered, the defendant set up a counter-
claim for damages for nondelivery. The contract was in the form of a
sales memorandum, as follows : " We have sold you for your account of
ourselves four to six cars daily ' Austen ' furnace coke, from now until
April 1, 1900. It is understood that this covers the entire output of fur-
nace coke from these ' Austen ' ovens. Price $3.20 per net ton, delivered
at your furnaces as named. Contracts subject to strikes, accidents or
other causes." The defendant offered to show by parol certain negotia-
tions prior to the date of the sales memorandum, by which a greater
quantity of coke had been sold, and at less price than named in the con-
tract. Plaintiff offered evidence which tended to show that the failure
of deliveries of which defendant complained was due to a shortage of the
only kind of cars which could be used to reach defendant's plant. *Held,*
(1) that parol evidence was inadmissible to contradict the plain terms of
the written instrument ; (2) that the words " or other causes," related to
shortage of cars, and that such shortage was a legal excuse for nondelivery.

*Practice—Pleadings—Assumpsit—Irregular practice.*

The record of an action of assumpsit which showed the filing of an an-
swer, a replication, an amended answer, an amended replication and
rejoinder, that the plaintiff's cause of action was stated in the amended
replication, and that no plea was filed, betrays a total disregard of the
statute regulating the practice in assumpsit in this state.

Argued March 7, 1904. Appeal, No. 154, Jan. T., 1903, by
defendant, from judgment of C. P. Northampton County, Dec.
T., 1900, No. 68, on verdict for plaintiff in case of Roy A.
Hatfield and Joseph Hillis, trading as Hatfield & Hillis, v.
Thomas Iron Company. Before MITCHELL, C. J., FELL,
BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Assumpsit for coke sold and delivered. Before SCOTT, J.

At the trial it appeared that the coke was sold and delivered
under the following agreement in writing :

" Sale Memorandum.

" Order No. 1,791.              PHILADELPHIA, June 10, 1899.
        " THOMAS IRON COMPANY,
                " Easton, Penna.

" Dear Sirs :—We have sold you for your account of our-
selves four to six cars daily ' Austen ' furnace coke, from now

until April 1, 1900.   It is understood that this covers the entire output of furnace coke from these ' Austen' ovens.

"Price, $3.20 per net ton, delivered at your furnaces as named.

"Terms, cash 15th of month, following shipment.

"Shipments as required to commence at once.

"Consign to Hokendauqua, Pa. via Catasauqua & Fogelsville R. R.

"Very truly,
                           "HATFIELD & HILLES.

"Contracts subject to strikes, accidents or other causes.

"Send all bills and bills of lading to this office.

"Accepted:
        "THOMAS IRON CO.,
        "B. F. FACKENTHAL, Jr., Prest."

The defendant set up a counterclaim for damages suffered by reason of nondelivery of some of the output of the Austen coke ovens.   In support of the counterclaim they offered evidence showing that shipments had been made of the Austen coke to Rainey & Company and the Ashland Coal & Coke Company.   The court admitted under objection and exception evidence that at the time these deliveries were made, there was a shortage of the Baltimore & Ohio cars which were the only cars which could reach the plant of the defendant. [5]

The defendant made various offers to prove negotiations prior to June 10, 1899, by which a greater quantity of coke had been sold, and at a less price than that named in the contract.   The court sustained objections to these offers. [1–4]

The court charged in part as follows :

[And, in order, therefore, that we get to the first point in the discussion, it will be important to consider what the contract was between these people which the defendant alleges to have been broken.   It is contained in the paper, called a sales memorandum, which has been read in your presence, connected with three letters, which have been marked in the case as exhibits, and also brought to your attention by either one or both of the counsel, and I will not proceed to embarass your consideration of the case any further by reading what is contained in any of those papers, but I will content myself

with stating the effect of them. These parties evidently intended to specify some definite amount or quantity of coke that should be furnished in the preliminary correspondence before it reached a point of conclusion, and it was stated at the indefinite figure of four to six cars daily. That was unsatisfactory to the defendant. The memoranda was returned with an explanation or with a suggestion that the defendant had purchased seven cars: to which the plaintiffs then returned an answer that the capacity of the cars had been changed, and they left the memoranda stand at from four to six cars, but they added to the provisions in the original written agreement that it was " understood that this covers the entire output of furnace coke from these Austen ovens." And they thus reached a point, starting from a purpose to set some definite amount as contracted for, to a place where they settled upon the whole output of the furnace coke from these ovens, leaving the other description as an estimate simply of the amount of the output: Brawley v. U. S., 96 U. S. 168. So you may, therefore, take it from me that this contract between the parties was a contract by which the plaintiff undertook to furnish to the Thomas Iron Company from the date of it or from June 12, to which the evidence has been referred, from June 12, 1899, to April 1, 1900, the obligation being upon the part of the plaintiffs to furnish—I say—the Thomas Iron Company, the whole output of furnace coke from the Austen ovens.] [6]

[It is claimed by the plaintiffs in this case that they are exempt—under the circumstances presented here by this proof, if you find it as they insist they have persuaded you, they are exempt under the clause " or other causes," to which the testimony has been referred, which relates to the shortage of cars and the embargo placed upon them with respect to the transportation of the supply furnished to the Ashland Coal and Coke Company and to Rainey & Company. Now, when an expression of that sort, a phrase of that kind is used in a general way, it is applicable to the same kind of an event or condition that is specifically expressed; and you may take it from me that when the result of strikes or accidents without the voluntary act of the plaintiffs in this case would have relieved from performance the car embargo or shortage was the " other

cause " which is of the same kind and character, if it resulted without the voluntary act of the plaintiffs and made performance as substantially impossible as the strike or accident would have made an impossibility of delivery under this contract ; it would exempt them from the full performance of the obligation in this contract. And that is one of the conditions presented by this evidence which it will be necessary for you to consider upon the two items of proof relating to the shipments to the Ashland Coal Company and the W. T. Rainey Company.] [7]

[Now, there are two items in addition to those I have referred to upon the part of the plaintiffs and the defendant— with respect to these particular items in which it is alleged they have failed to comply with the contract by furnishing the whole output of furnace coke, there are two other items to which the defendant has called your attention. One of those items relates to the coke that was furnished to the Ashland Coal & Coke Company in the two months of January and March, 1900 : 61 cars, amounting to 1,064 tons, is one of those items ; and the other is the coke that was furnished to W. T. Rainey & Company, carried in 17 cars, amounting to 457 tons, in September, 1899. You will remember what I have said about the exemption of the plaintiffs from the obligation of this contract arising from what is expressed by the phrase " other causes." It is conceded upon the part of the plaintiffs that in point of fact the defendant did not receive this output from the Austen Manufacturing Company. It is conceded, also, that these two items were shipments of furnace coke which it is admitted the defendant would otherwise be entitled to have received. It is claimed by the plaintiffs that in respect to those cars that were furnished to the Ashland Coal and Coke Company, in Kentucky, that at the particular time that coke was ready for shipment, it was impossible to get it transported to the Thomas Iron Company by reason of the fact that there was a shortage of cars ; they had to be shipped in cars that went west and not east ; they could only use the cars of the Norfolk & Western and Chesapeake & Ohio, but they could not get the cars of the Baltimore & Ohio. That is to say, the testimony is intended to persuade you—and you must say what effect it has in that particular—that under the methods by which the operations at these coke ovens were

conducted, it was substantially impossible that that coke could have remained there upon the wharves where it had been manufactured without being transported to some other place, to open the ovens for further operations, so that the business might go on. And in respect to the Rainey & Company shipment, which was in September, that there was an embargo upon the cars, that they could not get the cars, there was a strike at the mines in September and there was a difficulty about getting cars sufficient to transport the product. And it is maintained by the plaintiffs that these were causes operating upon the performance of the contract so as to make performance substantially impossible and thus bring it within the reservation and exemption of " other causes " in the written contract in the same way that strikes or accidents would exempt if they were occurring. Now, the impossibility of performance in that way, if it arose, arose through the acts of the manufacturers of this product at the Austen ovens and not of the plaintiffs; that is, the people at the Austen ovens were undertaking to ship this product, and it was their impossible performance that was the result of this embargo or shortage of cars, if it did in point of fact result. It was the plaintiffs' contract that they should ship this whole output to the defendant, subject only to exemption of strikes, accidents, and other causes; and if you find, if you are satisfied that from the manner in which these coke ovens were operated, it was substantially impossible to retain that coke upon the wharves and not ship it away to make room for the future operations, although the act was the act of the manufacturers of the product, then it would be also equally an exemption of the plaintiffs, if it became impossible in consequence of those acts to find shipment, if you are satisfied that it was in point of fact impossible of performance in that respect. Now these are questions upon which you must pass. If you find, in point of fact, that it was impossible, or practically impossible—which is all I am asked to say to you upon the part of the plaintiffs as constituting their exemption, if you find it was practically impossible to perform the contract in this way, it would be an exemption of the plaintiff from the obligation to pay for the breach of the contract in respect to failure to furnish the coke that went to the Ashland Coal and Coke Company, or to W. T. Rainey &

Company, or either one of them, just as you may find the fact to be with respect to one and not the other, or as to both. But if you should find that it is thus not included within this class, if you should find that the evidence fails to satisfy you that by the operations as they were conducted it was practically impossible, and that the contract might reasonably have been fulfilled by these plaintiffs in the way of furnishing the whole of that output which the manufacturers sent to the Ashland Coal and Coke Company or to Rainey & Company, then the defendant would have the right to ask damages against the plaintiffs' claim for the amount of the loss which he suffered in consequence of this breach in that particular.] [8]

Verdict and judgment for plaintiff for $4,135.47. Defendant appealed.

*Errors assigned* were (1–5) rulings on evidence, quoting the bill of exceptions; (6–8) above instructions, quoting them.

*Wm. Fackenthall,* for appellant.—The parol evidence was improperly excluded: Holloway v. Frick, 149 Pa. 178; Robinson Machine Co. v. Hazel Kirk Gas Coal Co., 204 Pa. 177; Nye v. Pittsburg Co., 2 Pa. Superior Ct. 384; Holt v. Pie, 120 Pa. 425; Selig v. Rehfuss, 195 Pa. 200; Anderson v. National Surety Co., 196 Pa. 288.

Impossibility of performing a contract arising after the making of it, although without any fault on the part of the covenantor, does not discharge him from his liability under it: Jacksonville, etc., Ry. & Nav. Co. v. Hooper, 160 U. S. 514 (16 Sup. Ct. Repr. 379); Hand v. Baynes, 4 Wharton, 204; Cope v. Dodd, 13 Pa. 33; Hoy v. Holt, 91 Pa. 88; Sandiman v. Breach, 7 Barnewall & Cresswell, 96; Chicago, etc., Ry. Co. v. Hoyt, 149 U. S. 1 (13 Sup. Ct. Repr. 779); Bucher v. Com., 103 Pa. 528.

*James Collins Jones,* with him *Kirkpatrick & Maxwell,* for appellee.

OPINION BY MR. JUSTICE MESTREZAT, March 21, 1904:

A very careful examination of the questions raised in this voluminous record fails to disclose to us wherein the appellant

has convicted the trial judge of error. The case was most carefully tried. The charge was entirely adequate and the rulings on the admission of testimony, complained of in the assignments, are fully sustained by the reasons given by the trial judge.

The court below very properly held that the sales memorandum was the contract between the parties by which the plaintiffs agreed to sell and deliver the coke to the defendant company, and that the parol testimony offered by the defendant was not admissible to contradict the written agreement. The defendant did not propose to show a parol contemporaneous agreement inducing the execution of the written contract between the parties nor that the execution of the written agreement was procured by fraud, accident or mistake. The offer was simply to contradict the written agreement by showing by parol certain negotiations prior to June 10, 1899, the date of the sales memorandum, by which a greater quantity of coke had been sold and at less price than that named in the contract. This was the effect of the testimony offered by the appellant and, being clearly incompetent, the learned trial judge properly excluded it. The contract between the parties was explicit as to the quantity of the coke sold and the price to be paid. The quantity was " the entire output of furnace coke from these ' Austen ' ovens," and the " price, $3.20 per net ton, delivered at your furnaces as named." The number of cars of coke mentioned in the contract was properly held to be an estimate of the probable output of the ovens and not a guaranty that the plaintiffs would furnish that many cars to the defendant company. This is made plain by the letters put in evidence by the defendant company, which conclusively show that the quantity sold was not any definite number of cars of coke, but the entire output of furnace coke from the Austen ovens.

The contract was made " subject to strikes, accidents or other causes." Shipments of coke to the defendant company were made from the Austen ovens from the date of the contract in June, 1899, to April 1, 1900. It is conceded by the plaintiffs that there were shipped from these ovens in September, 1899, seventeen cars of furnace coke to W. T. Rainey & Company, and in January and March of 1900, sixty-one cars of furnace coke to the Ashland Coal & Coke Company, and it is

therefore claimed by the defendant company that this constituted a breach of the contract by which the plaintiffs sold to it "the entire output of furnace coke from these 'Austen' ovens." In reply to this contention, the plaintiffs allege that there was a car shortage at the time of these shipments of coke and that they were prevented from shipping it to the defendant by reason of their inability to obtain cars for the purpose. It was claimed by the plaintiffs that in shipping the coke to the defendant company they were compelled to use cars of the Baltimore & Ohio Railroad Company that went west and could not use cars of other railroads that went east, that there was a shortage of Baltimore & Ohio cars going west, that to keep the Austen ovens in operation to supply coke to defendant in the future it was absolutely necessary to remove the coke from the wharves where it was manufactured, and that the coke was shipped over the railroads to the Rainey and Ashland companies for this reason and under these circumstances. It was contended by the plaintiffs that for these reasons it was impossible to ship coke to the defendant company at this time and that, therefore, they were relieved from shipping this coke to the defendant under the words " other causes " in the exemption clause of the contract. The learned trial judge submitted to the jury, with proper instructions, the questions of fact raised by this contention and, in sustaining the plaintiffs' construction of the exemption clause, charged as follows: " It is claimed by the plaintiffs in this case that they are exempt— under the circumstances presented here by this proof, if you find it as they insist they have persuaded you, they are exempt under the clause 'or other causes,' to which the testimony has been referred, which relates to the shortage of cars and the embargo placed upon them with respect to the transportation of the supply furnished to the Ashland Coal & Coke Company and to Rainey & Company. Now, when an expression of that sort, a phrase of that kind is used in a general way, it is applicable to the same kind of an event or condition that is specifically expressed; and you may take it from me that when the result of strikes or accidents without the voluntary act of the plaintiffs in this case would have relieved from performance the car embargo or shortage was the ' other cause ' which is of the same kind and character, if it resulted without the volun-

tary act of the plaintiffs and made performance as substantially impossible as the strike or accident would have made an impossibility of delivery under this contract; it would exempt them from the full performance of the obligation in this contract." He also charged in this connection: "If the plaintiffs were able to make shipments and get them made reasonably practicable in any other way (than over the Baltimore & Ohio Railroad) and in any other cars (than those of the Baltimore & Ohio Company) and routed in any other direction, it was their duty under their contract to see that the Austen Manufacturing Company made the shipments in that way."

It will thus be seen that the trial judge required the plaintiffs to show that they had fully complied with their contract to ship the defendant company the entire output of furnace coke of the Austen ovens, except in so far as they were relieved by the exemption clause of the agreement. The right of the parties to stipulate for exemption for performance of a part or all of the covenants of their agreement under certain conditions is and necessarily must be unquestioned. Here they have done so, and the exemption clause in this contract was, as we think, properly interpreted by the trial court. It was clearly not the intention of the parties to give such a restrictive meaning to the words "other causes" used in the contract, as would render them inapplicable where shipments of coke were prevented by the shortage of railroad cars. Both parties to the contract well understood, what is known generally and especially by those engaged in and connected with the coke business, that a car shortage might occur at any time and that it is as effective to prevent the delivery of coke as strikes or accidents. As well stated by one of the defendant's witnesses, the failure to furnish cars to shippers or purchasers of coke is frequently a cause of war "between the cokeman and the railroad company" which, the witness might have added, has so far ended in the capitulation of the cokeman. Keeping these facts in view, it would be a very strained construction of the contract to hold that the parties did not intend that a car shortage should be included in the "other causes" which would relieve plaintiffs from the duty of delivering the whole product of the Austen ovens. In fact, it is not apparent to what other cause these words would apply. Certainly there

could be none more effective to prevent the shipment of the coke. The necessity, therefore, for the plaintiffs protecting themselves by contract from a shortage of cars is as manifest as is the like necessity of protecting themselves from their inability to deliver the coke for the specific reasons of strikes or accidents. We are satisfied that the construction placed upon the agreement by the court below is the proper interpretation of the language employed in the instrument and that it carries out the intentions of the parties.

The disposition made by the learned trial judge of the other questions raised by the assignments is so clearly correct that they need not be discussed here.

There are unfortunately no assignments which will enable us to review the pleadings in this case. There is no precedent for them at common law, and they are in total disregard of the statute regulating the practice in this state. The action is assumpsit, and the act of 1887 required the plaintiffs to file " a concise statement of the plaintiff's demand " and the defendant to enter the statutory plea. An issue would then have been formed and the case would have been ready for trial. Here the record shows the filing of an answer, a replication, an amended answer, an amended replication and a rejoinder. The plaintiffs' cause of action is stated in the amended replication. No plea was filed. The pleadings cover eighty-three pages of the appellant's paper-book. This system of pleading, which seems to prevail in the court below, presented no well defined issue for determination by a court and jury, and resulted, as might well be expected, in confusion and uncertainty as to the real issues involved in the controversy.

The judgment is affirmed.